UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIMINAL NO. 14-289 (SRN/JSM)

　　　　Plaintiff,

v.                                                    <u>REPORT AND RECOMMENDATION</u>

ELEUTERIO IZAZAGA-PASCACIO (4),

　　　　Defendant.


The above matter came before the undersigned United States Magistrate Judge upon Defendant Eleuterio Izazaga-Pascacio's Motion to Suppress All Evidence Obtained from Unlawful Searches and Seizures [Docket No. 346]; Defendant Eleuterio Izazaga-Pascacio's Motion to Suppress Statements Made by Defendant [Docket No. 347]; and Defendant Eleuterio Izazaga-Pascacio's oral motion to suppress any evidence obtained from a search warrant permitting the use of a GPS tracking device.[1]

　　　　Allen A. Slaughter, Assistant United States Attorney, appeared on behalf of the Government.   Daniel L. Gerdts, Esq., appeared on behalf of defendant, who was personally present.

---

[1]　　In a motion filed by his former counsel, Ryan Pacyga, defendant sought to suppress evidence obtained from law enforcement's use of a GPS tracking device on a grey Acura, as well as any statements obtained from any intercepted wire or oral communications.   See Docket No. 180 (Motion to Suppress the Contents of Any Intercepted Wire or Oral Communications and Evidence Derived Therefrom).   On March 19, 2015, the Court conducted a hearing to address motions of all defendants in this case, including motions filed by Pacyga on behalf of defendant.   At the conclusion of that hearing, the Court informed those counsel who had filed boilerplate motions that if they did not submit supporting memoranda explaining the legal and factual basis for their Title III motions by April 2, 2015, the Court would deem the motions as withdrawn. On April 2, 2015, Pacyga communicated via letter to the Court that he would be filing no memorandum in support of his motion to suppress the contents of any intercepted wire or oral communications.   The next day, counsel confirmed that he was withdrawing both the motion and the supporting memorandum.   Based on those communications, the Court terminated Docket No. 180.

The matter has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

## I.   FACTUAL BACKGROUND

### A.   <u>Hearing Testimony</u>

On December 14, 2015, the Court held an evidentiary hearing and took testimony from Agent Jeffrey Benadum of Homeland Security Investigations ("HSI").[2] Agent Benadum testified that in July, 2011, the HSI office in St. Paul was notified by agents at HSI Miami that they had been contacted by a group in Mexico to pick up a large sum of bulk cash in the Minneapolis, Minnesota area and to launder the cash into Mexico.  Transcript of December 14, 2015 Motions Hearing, p. 13 ("Tr.") [Docket No. 354].  HSI Miami sent representatives to Minnesota, and within two or three weeks, HSI agents "laundered" approximately $400,000 for the group in Mexico.  Tr. 13, 74.  The group contacted HSI again within the three-week period to launder an additional $200,000, but that money was seized by law enforcement agents.  Id.  During this initial investigation and seizure, HSI identified a Heriberto Penaloza as a primary target.  Tr. 14.

HSI then began investigating other individuals who had been identified delivering the bulk cash to the undercover agents.  Id.  Officers determined that Heriberto Penaloza ran a "tight knit group" consisting mostly of family members including his brother Eduardo Penaloza, his uncle Leonel Penaloza, and his cousins Israel Penaloza and Gilberto Penaloza.  Tr. 15.  This group operated an auto repair shop called Auto Laser.  Tr. 14-15, 25.  After conducting more than 500 hours of surveillance in 2011 and

---

[2]    In the hearing transcript, the HSI agent's name is spelled "Benadul."  However, both parties consistently refer to him as Agent "Benadum."  To avoid confusion, the Court will use the spelling endorsed by the parties.

2012, law enforcement officers determined that Auto Laser was not making money based on the number of vehicles moving in and out of the business.  Tr. 25.  Officers also learned that none of the three individuals that opened Auto Laser knew anything about repairing vehicles.[3]  Tr. 25-26.  Ultimately, law enforcement concluded that Auto Laser was a front for a money laundering operation.  Tr. 25.

### 1.   Israel Penaloza

On August 25, 2011, law enforcement officers conducted a traffic stop of Israel Penaloza ("Israel"), who, unbeknownst to him, was on his way to deliver $200,000 in cash to undercover agents.  Tr. 15-16.  During the traffic stop, Israel told officers he had no idea what was in the vehicle.  Tr. 16.  Upon searching the vehicle, officers discovered approximately $200,000 of United States currency, but Israel denied ownership of the cash.  Id.  Israel was subsequently deported from the United States.  Id.

### 2.   Gilberto Penaloza

On April 5, 2012, Gilberto Penaloza ("Gilberto") was arrested on a traffic stop by the Fridley Police Department, and officers were able to ascertain his residence in Fridley, Minnesota.  Tr. 16, 17-18.  When police arrived at Gilberto's residence, a female occupant who claimed to be Gilberto's girlfriend consented to a search of the premises.  Tr. 16-17.  During the search, officers discovered a two-drawer filing cabinet located in a closet under the stairs on the lower level of the residence.  Tr. 21.  The filing cabinet contained a handgun and a clear plastic bag holding approximately one pound of methamphetamine.  Tr. 17, 21; Gov't Exs. 1-D, 1-E, 1-F.  Additionally, on the lower level of the residence, officers seized a digital scale, United States currency, carbon

---

[3]         Agent Benadum testified that Auto Laser eventually hired a mechanic.  Tr. 26.

paper and packaging material.  Tr. 22; Gov't Ex. 1-G.  Inside Gilberto's bedroom was a box containing additional cash.  Tr. 22; Gov't Exs. 1-H, 1-I.  Law enforcement also searched the attic of the main bedroom and found 28 to 30 plastic wrappings; officers estimated that at one point, each wrapping contained approximately one pound of methamphetamine.  Tr. 22; Gov't Ex. 1-J.  Lastly, police discovered a black package containing United States currency, which was located above a ceiling panel on the lower level.  Tr. 23; Gov't Exs. 1-K, 1-L.  In total, law enforcement seized approximately $350,000 and about one pound of methamphetamine.  Tr. 17, 23-24.  Agent Benadum testified that the $350,000 was scattered throughout the house—hidden in the ceiling tiles, under beds, in drawers and in closets.  Tr. 24.  Following the search, Gilberto told police he had no idea who owned the money, handgun or methamphetamine.  Tr. 23.

### 3.    Heriberto Penaloza

Agent Benadum testified that Heriberto Penaloza ("Penaloza") was an illegal alien who had been deported from the United States three times.  Tr. 54.  According to Agent Benadum, Penaloza was very illusive and difficult to follow on paper.  Tr. 26.  He did not have any property in his name, including residences or business; instead, he relied on at least three different girlfriends to rent homes and register vehicles in their names.  Tr. 26-27.  By the fall of 2012, law enforcement knew that Penaloza stayed or slept at five to seven different locations and drove more than ten different vehicles, none of which were titled in his name.  Tr. 27.  Although law enforcement officers were not able to ascertain how many phones Penaloza used at any given time, they observed that it was always more than one, and usually more than two.  Id.  In addition, Penaloza frequently changed phones and phone numbers.  Tr. 28.  While driving, Penaloza employed counter-surveillance tactics such as making frequent U-turns, speeding up

and slowing down, and making unlawful turns to determine if anyone was following him. Tr. 28-29.  At times, he would use his phones to record license plates or descriptions of vehicles in case he saw the same vehicle again later that day or in another location.  Tr. 29.

On September 10, 2012, law enforcement arranged for the purchase of a sample of methamphetamine from Penaloza through the use of a confidential informant ("CI"). Tr. 29.  Penaloza instructed the CI to meet him at a bus stop on foot, taking several turns along the way to ensure he was not being followed.  Id.  Eventually, the CI met with Penaloza and obtained a sample of methamphetamine.  Tr. 30.  A short time later, the CI contacted Penaloza again to purchase one ounce of methamphetamine.  Id. Penaloza gave the CI approximately one hour to meet him on foot, once again cutting through yards and houses to avoid detection.  Id.  The CI successfully purchased one ounce of methamphetamine from Penaloza.  Id.

On November 9, 2012, the CI called Penaloza and ordered two ounces of methamphetamine.  Id.  Penaloza told the CI that he would send someone to deliver the methamphetamine; he would not be delivering it himself.  Tr. 31.  Penaloza directed the CI to a bathroom in a Home Depot in Inver Grove Heights, Minnesota.  Id.  Law enforcement officers monitored the CI and "kept eyes on him" until he entered the Home Depot bathroom.  Id.  An unidentified individual then entered the bathroom and handed the CI a bag containing two ounces of methamphetamine.  Id.  Following the exchange, the CI received a call from Penaloza asking if everything was good.  Id.  Penaloza told the CI not to follow the courier and not to say anything about the courier to anyone else. Id.

### 4.    Defendant Eleuterio Izazaga-Pascacio

By the fall of 2012, police learned that an individual known as "El Tigre" was accompanying Penaloza. Id. According to Agent Benadum, El Tigre was from Fresno, California and was believed to be Penaloza's boss. Id. At that time, law enforcement knew nothing more about El Tigre other than his physical description, which officers had obtained from the CI. Id.

On February 7, 2013, police set up another controlled purchase of methamphetamine from Penaloza. Tr. 32. The CI contacted Penaloza, ordered four ounces of methamphetamine, and negotiated to pay one half of the value up front and the remaining half within the week. Tr. 32, 41. Penaloza told the CI to go to a bathroom inside a Home Depot in Minneapolis. Tr. 32. Penaloza arrived at the Home Depot driving a grey Acura bearing license plate XXX005. Id.; Gov't Ex. 2-A. Defendant was observed riding in the front passenger seat of the Acura. Tr. 32, 33; Gov't Ex. 2-A. Both defendant and Penaloza entered the Home Depot, and Penaloza delivered the methamphetamine to the CI in the bathroom. Tr. 34; Gov't Exs. 2-B, 2-C. Following the exchange, Penaloza exited the Home Depot, followed shortly thereafter by defendant. Tr. 80. Defendant and Penaloza left the premises together in the Acura. Tr. 34; Gov't Ex. 2-D. At that point, law enforcement did not know defendant's identity, but they suspected that he might be El Tigre. Tr. 34. According to Agent Benadum, when asked what El Tigre looked like, the CI described an individual who looked very similar to defendant. Tr. 78.

On February 11, 2013, Penaloza spent the night at XXX Colfax Avenue in Southwest Minneapolis ("Colfax Apartment"). Tr. 36. Police suspected that Penaloza was residing at the Colfax Apartment and was possibly using it as a drug stash house.

Tr. 36-37.  On February 13, 2013, the property manager gave officers access to the Colfax Apartment building, and a canine sniff was conducted in the common hallway of Apartment XXX.  Tr. 37-38.  Based on the results of the canine sniff, officers obtained a search warrant for Apartment XXX, which was issued the same day.  Tr. 38.

During this general time period, law enforcement continued to conduct physical and electronic surveillance on Penaloza.  Id.  By pinging Penaloza's phone, officers saw that he was moving frequently between the Colfax Apartment and an apartment complex in Edina, Minnesota.  Tr. 38-39, 45.  Penaloza used the grey Acura to travel back and forth between the two locations.  Tr. 45.

On February 14, 2013, the CI called Penaloza and arranged to pay the remaining half of the money due from the February 7, 2013 controlled purchase of methamphetamine.  Tr. 41.  Penaloza told the CI that he was sick and that he would be "sending his guys" to pick up the money at a Boston Market restaurant in Richfield, Minnesota.  Tr. 42.  Law enforcement pinged Penaloza's phone at that time and confirmed that he was at the Colfax Apartment.  Tr. 39-40.  Police then initiated surveillance of the grey Acura used during the previous controlled deliveries of methamphetamine.  Tr. 39.  The Acura was driven by a Miguel Morales and defendant was a passenger in the vehicle.  Id.  Law enforcement maintained physical surveillance of the Acura as it traveled to various locations in the metro area.[4]  Id.; Gov't Exs. 3-A, 3-B, 3-C, 3-D, 3E.  Eventually, the Acura arrived at a Boston Market in Richfield.  Tr. 42-43.  Both defendant and Morales entered the Boston Market, and the CI handed the

---

[4]     According to Agent Benadum, defendant and Morales ran a variety of errands that day, many of which were ordinary in nature.  Tr. 81-82.

agreed-upon payment to defendant in the bathroom of the restaurant.  Tr. 43, 81.  There was no discussion regarding what the money was for.[5]  Tr. 81.

Law enforcement continued physical surveillance as defendant and Morales exited the restaurant and left the premises in the Acura.[6]  Tr. 43; Gov't Exs. 3-F, 3-G. Officers followed the Acura to an apartment complex at XXX Parklawn in Edina ("Parklawn Complex").  Tr. 43.  Law enforcement suspected that the Parklawn Complex was the other residence used by Penaloza for drug trafficking.  Tr. 43-44.  Within one or two hours after leaving the Boston Market, defendant and Morales exited the Parklawn Complex with a shopping cart and headed towards the grey Acura.  Tr. 44; Gov't Exs. 3-H, 3-I.  Defendant and Morales began unloading items from the trunk of the Acura into the shopping cart to take back into the apartment building.  Tr. 44-45; Gov't Exs. 3-J, 3-K.  Many of these items were ordinary household items such as bathroom tissue.  Tr. 81-82.

On February 15, 2013, law enforcement prepared to execute the search warrant at the Colfax Apartment.  Tr. 46.  Officers positioned themselves around the area at approximately 11:30 a.m. and planned to initiate the search at 1:00 p.m.  Id.  However, at about 12:50 p.m., defendant, Penaloza and Morales arrived at the Colfax Apartment in the grey Acura.  Tr. 47.  The three men entered the apartment building through the front door.  Tr. 48.  Five to ten minutes later, Morales came out of the building and moved the Acura to the rear of the apartment complex.  Id.  Defendant, Penaloza and Morales then carried bags from the apartment and loaded them into the trunk of the

---

[5]      The CI was wearing a wire during this exchange.  Tr. 81.

[6]      Agent Benadum testified that the Acura was always driven by Morales; defendant was always a passenger.  Id.

Acura.  Tr. 48-49.  Sometime between 1:15 and 1:30 p.m., defendant, Penaloza and Morales entered the Acura and headed to a nearby CVS drugstore on Lake Street in Minneapolis.  Tr. 49.  Law enforcement continued surveillance on the Acura but eventually lost sight of the vehicle.  Tr. 50.  However, officers maintained a GPS ping on Penaloza's phone, and based on the ping, police believed the Acura was on its way to the Parklawn Complex, and officers headed to that location.  Id.  Upon arriving at the Parklawn Complex, officers spotted the grey Acura sitting unoccupied in the parking lot. Tr. 53.

Back at the Colfax Apartment, and following the departure of the Acura, law enforcement executed the search warrant at about 1:30 p.m.  Tr. 51.  During the search, officers discovered 33 pounds of methamphetamine stored in a locked two-drawer filing cabinet located inside a closet in Apartment XXX.  Tr. 51-53; Gov't Exs. 4-A, 4-D. Agent Benadum testified that the two-drawer filing cabinet was "very, very similar to the exact type of . . . two-drawer filing cabinet that [law enforcement] found at Gilberto Penaloza's residence."  Tr. 51.  Police also found four pounds of marijuana located in a box on a shelf above the two-drawer filing cabinet.  Tr. 52, 53; Gov't Exs. 4-B, 4-E. Based on the results of the search at the Colfax Apartment and the totality of the investigation, law enforcement decided to arrest defendant, Penaloza and Morales, if located.  Tr. 54.

At approximately 2:30 p.m. that day, officers at the Parklawn Complex observed defendant and Penaloza exiting the building and walking towards the Acura.  Tr. 55. Penaloza got in the front passenger seat of the Acura and defendant sat in the rear passenger seat behind him.  Id.  Shortly thereafter, Morales came out of the apartment building through the same door as defendant and Penaloza, and began walking towards

the Acura.  Tr. 56.   Before Morales reached the Acura, law enforcement officers approached and arrested him.  Id.  Defendant and Penaloza were also placed under arrest.  Id.  Police initiated a field interview of defendant and Morales.  Id.  Morales gave his name and stated that he lived at the Parklawn Complex in apartment XXX.  Id.  Defendant identified himself, gave his date of birth and produced a California driver's license with his address.  Id.  At that time, law enforcement officers conducted an inventory search of the Acura.  Tr. 63, 64. The search produced nothing of evidentiary value.  Tr. 85.

After the inventory search, defendant was brought to the Hennepin County Law Enforcement Center.  Tr. 65.  Officers interviewed defendant at approximately 6:00 p.m.  Tr. 65-66; Gov't Ex. 6.  Prior to the interview, defendant was read his Miranda rights in English and in Spanish.  Tr. 67-68; Gov't Exs. 7, 8.  Defendant indicated that he understood his Miranda rights and agreed to speak with law enforcement.  Tr. 72.  During the interview, defendant gave incriminating statements.

### B.    Motions to Suppress and Government Response

Defendant has sought to suppress all evidentiary fruits of his arrest on February 15, 2013, including his identity, his residence, his finger and handprints, and his statements given to law enforcement officers during his post-arrest interview at the Hennepin County Law Enforcement Center.   In support of his motions, defendant argued that police lacked probable cause to support his arrest on February 15, 2013.  Defendant Eleuterio Izazaga-Pascacio's Post-Hearing Memorandum of Law in Support of Motions to Suppress, pp. 2-7 ("Def.'s Mem.") [Docket No. 360].[7]   Defendant

---

[7]      At the hearing on December 14, 2015, defendant's current counsel, Daniel Gerdts, brought an oral motion to suppress evidence resulting from a search warrant permitting the use of a GPS tracker on the grey Acura.  Tr. 3-6.  Defendant  also

maintained that even though there was probable cause to believe Penaloza was involved in narcotics trafficking and money laundering, law enforcement officers had no basis for finding probable cause to arrest defendant.  Id., p. 5.  Further, the mere fact that defendant was observed associating with Penaloza does not, by itself, support a finding of probable cause.  Id. (citing United States v. Castro-Gaxiola, 479 F.3d 579, 583 (8th Cir. 2007); United States v. Everroad, 704 F.2d 403, 406 (8th Cir. 1983)).

In support, defendant contended that on February 7, 2013, he was not present for the controlled purchase of methamphetamine in the Home Depot bathroom, and there was nothing to suggest he had any greater knowledge of the sale than anyone else in the store at the same time.  Id., pp. 5-6.  With regard to the exchange of money at the Boston Market on February 14, 2013, defendant pointed out that there was no discussion regarding what the money was for.  Id., p. 6.  As for the discovery of a large amount of narcotics in the Colfax Apartment, defendant submitted that the drugs were "well hidden in a closet, in a locked filing cabinet or in a nondescript box on the closet shelf."  Id.  There was no evidence at the time of the search that anyone would have been aware of the drugs merely by being present in the apartment.  Id.

---

confirmed that he was seeking to suppress all statements obtained from the custodial interrogation that took place on February 14, 2013, on grounds that they were coerced, not voluntary and were obtained in violation of the requirements of Miranda v. Arizona, 384 U.S. 436 (1966). See Docket No. 347; Tr. 3.  However, in his post-hearing memorandum, defendant conceded that based on the evidence adduced at the hearing, the "Government had carried its burden of demonstrating that the installation and use of the tracking device was constitutionally effected; and, with respect to the motion to suppress statements, the Government has carried its burden of proof that the statements were not the product of coercion and that the police interrogators properly followed the prophylactic requirements of the Miranda case."  Def.'s Mem., pp. 1-2. Thus, based on these representations, the Court will recommend that defendant's oral motion to suppress any evidence obtained from the search warrant for the GPS tracker should be denied, and the Court will only address defendant's argument that all statements  given by him should be suppressed because there was no probable cause to arrest him.

The Government responded that the totality of circumstances demonstrated that defendant was not "merely present" during the illegal activities observed in this case. Government's Post-Hearing Response to Defendant's Suppression Motions, p. 15 ("Gov't Mem.") [Docket No. 364].   By February, 2013, law enforcement agents had investigated and ascertained Penaloza's drug trafficking activities and had observed Penaloza to be extremely cautious and elusive. Id., p. 12.   Nevertheless, Penaloza brought defendant with him to his third controlled delivery of methamphetamine at the Home Depot in Minneapolis on February 7, 2013.   Id., p. 13.   According to the Government, these facts alone could lead a reasonable agent to believe defendant was part of Penaloza's drug trafficking organization, especially after law enforcement succeeded in obtaining methamphetamine from Penaloza.  Id.

The Government also noted that agents had observed defendant riding in the grey Acura used by Penaloza for his drug trafficking business, as well as running errands with Morales on February 14, 2013 while Penaloza was ill. Id.  These errands included collecting money owed for the February 7, 2013 controlled purchase of methamphetamine.   Id., pp. 13-14.   Further, the following day, officers observed defendant helping Penaloza loading bags from the Colfax Apartment into the grey Acura.  Id., p. 14.   Immediately after defendant and Penaloza left the premises, police searched the Colfax Apartment and recovered a large amount of methamphetamine and marijuana "stored in a manner and means (a two-drawer file cabinet) previously used by what agents knew was another DTO associate."  Id.  For all of those reasons, the Government maintained that law enforcement officers had probable cause to arrest defendant on February 15, 2013.  Id., p. 3.

## II.    DISCUSSION

"'To justify a warrantless arrest, probable cause must exist.'"  United States v. Houston, 548 F.3d 1151, 1154 (8th Cir. 2008) (quoting United States v. Adams, 346 F.3d 1165, 1169 (8th Cir. 2003)).  "Probable cause to make a warrantless arrest exists if 'the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant had committed or is committing an offense.'"  United States v. Allen, 713 F.3d 382, 386 (8th Cir. 2013) (quoting United States v. Torres-Lona, 491 F.3d 750, 755 (8th Cir. 2007)); see also United States v. Oropesa, 316 F.3d 762, 768 (8th Cir. 2003) (finding that probable cause "'exists when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested.'") (quoting United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001)).  To determine the existence of probable cause, "[w]e consider 'the totality of the circumstances as set forth in the information available to the officers at the time of arrest.'"  United States v. Quiroga, 554 F.3d 1150, 1154 (8th Cir. 2009) (quoting United States v. Kelly, 329 F.3d 624, 628 (8th Cir. 2003)).  "The totality of circumstances are viewed in light of the officer's experience and familiarity with drug trafficking."  Castro-Gaxiola, 479 F.3d at 583 (citing United States v. Bailey, 417 F.3d 873, 877 (8th Cir. 2005)).

"We must give law enforcement officers substantial latitude in interpreting and drawing inferences from factual circumstances, but such latitude is not without limits."  United States v. Adams, 346 F.3d 1165, 1170 (8th Cir. 2003) (internal quotation marks omitted) (quoting Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999)).  "While bare suspicion of criminal activity is not sufficient to establish probable cause," Id. at 1169-

70, "[a]rresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest."  United States v. Winarske, 715 F.3d 1063, 1067 (8th Cir. 2013) (citing United States v. Webster, 625 F.3d 439, 442 (8th Cir. 2010)).  "Instead, the mere 'probability or substantial chance of criminal activity, rather than an actual showing of criminal activity,' is all that is required."  Winarske, 715 F.3d at 1067 (citing United States v. Mendoza, 420 F.3d 663, 667 (8th Cir. 2005)).

The gist of defendant's motion to suppress is that his mere association with Penaloza and presence at the scene of suspected drug trafficking activity was not, by itself, sufficient to support a finding of probable cause to arrest him, and thus, any all evidentiary fruits from that arrest must be suppressed.

It is well established that "'mere association with a known or suspected criminal, or mere presence in that person's automobile, does not create probable cause to arrest.'"  United States v. Caves, 890 F.2d 87, 94 (8th Cir. 1989) (quoting United States v. Clark, 754 F.2d 789, 791 (8th Cir. 1985)); see also United States v. Mims, 567 F. Supp. 2d 1059, 1077 (D. Minn. 2008) ("[M]ere association with a known or suspected criminal ... does not create probable cause to arrest.") (quoting Everroad, 704 F.2d at 406).  "Nor is probable cause established by the presence of a person in a location known to be frequently involved in narcotics sales or other crimes."  Everroad, 704 F.2d at 406 (citation omitted).

At the same time, in assessing probable cause based on association with persons suspected of engaging in criminal activity, a court should consider whether the nature of the criminal activity is such that it could not normally be carried on without the knowledge of all persons present.  Clark, 754 F.2d at 791-92 (citing United States v.

<u>Hillison</u>, 733 F.2d 692, 697 (9th Cir. 1984)).   In addition, the Eighth Circuit has repeatedly found probable cause in cases where the association between the defendant and a criminal suspect was contemporaneous with the time of the criminal activity. <u>Caves</u>, 890 F.2d at 95 (citing <u>Clark</u>, 754 F.2d at 791; <u>United States v. Hillison</u>, 733 F.2d 692, 697 (9th Cir. 1984)); <u>see also</u> <u>United States v. Sotelo</u>, Crim. No. 09-254 (JNE/AJB), 2010 WL 598606, at *3 (D. Minn. Feb. 8, 2010) ("The Eighth Circuit has repeatedly distinguished <u>Everroad</u> in cases where the association between an individual and another engaged in suspected criminal activity took place at the time of the criminal activity.") (citing <u>Caves</u>, 890 F.2d at 95; <u>United States v. Vravis</u>, 761 F.2d 513, 515–16 (8th Cir.1985); <u>Clark</u>, 754 F.2d at 791).

In <u>Everroad</u>, the Eighth Circuit reversed the district court's finding that officers had probable cause to arrest Everroad for drug trafficking offenses.  704 F.2d at 407. The appellate court summarized the facts supporting the district court's finding of probable cause as follows:

> First, the agents observed Everroad accompanying Bragg, whom the agents knew was then involved in a drug transaction, to areas where the deal was being arranged. Second, under Bragg's plan, [undercover] Agent Carter would receive the cocaine within a half hour after he received the marijuana; and the agents knew that Everroad's motel was located within the one-half hour radius of the place where Bragg delivered the marijuana.

<u>Id.</u> at 406.

With respect to the first fact, the court noted that "mere association with a known or suspected criminal, or mere presence in that person's automobile, does not create probable cause to arrest. . . . Nor is probable cause established by the presence of a person in a location known to be frequently involved in narcotics sales or other crimes." <u>Id.</u> (citations omitted).  As to the second fact, the location of Everroad's hotel, the court

held that "such physical proximity to a crime combined simply with a brief association with a suspected criminal—when there is no other unlawful or suspicious conduct by any party involved—cannot support a finding of probable cause." Id. at 407.

In Vravis, an undercover DEA agent, Special Agent Carter, arranged to purchase cocaine from Vravis's co-defendant Lonnie Clark. 761 F.3d at 514. Clark told Agent Carter that his drug source was en route and that he would call the next day with details. Id. The following morning, Clark called Agent Carter and said "the guys" had arrived and were waiting to get their money. Id. Clark told Agent Carter to come to a flower shop in Des Moines, Iowa as soon as possible so that his drug source, whom Clark called "the guys" and "city boys," would stick around. Id. Clark also stated that he had a tire problem and that "the guys" were fetching a new one. Id. Agent Carter then radioed for assistance, and Special Agents Thornton and Overbaugh arrived at the scene to conduct surveillance. Id. at 514-15. Agents Thornton and Overbaugh spotted Clark's car and advised Agent Carter of the presence of a white car with Illinois license plates. Id. at 515. One of the occupants of the white car, Vravis, was examining Clark's left front tire. Id.

When Agent Carter arrived on scene, he saw Clark, his wife Rebecca Clark, and their child sitting in Clark's car. Id. He also observed a white car with Illinois plates parked in an adjacent parking lot. Id. Agent Carter parked his vehicle next to Clark's vehicle. Id. Clark got into Agent Carter's vehicle and handed him three ounces of cocaine in exchange for $6,300 in bills with prerecorded serial numbers. Id. Agent Carter asked about the source of the cocaine, and Clark responded that "the guys" were over there waiting. Id. Clark then returned to his own vehicle, drove to the adjacent lot, and got into the white car with Illinois plates. Id. Approximately ten minutes later, Clark

returned to his car, and both vehicles attempted to leave the parking lot. Id. However, the three DEA agents intercepted Clark's vehicle and the white car and placed the occupants under arrest. Id. A search of the two vehicles produced evidence of Vravis's participation in drug trafficking. Id. On Vravis's person, officers found one of the marked bills Agent Carter had given to Clark. Id.

Prior to trial, Vravis moved to suppress the evidence obtained from his vehicle and from his person. Id. Vravis argued that his association with a known or suspected criminal did not create probable cause to arrest. Id. (citing Everroad, 704 F.2d at 406). The district court denied Vravis's motion, and a jury returned a guilty verdict against both Vravis and Clark. Id. On appeal, the Eighth Circuit affirmed the district court's decision, finding that the facts implicating Vravis in drug trafficking revealed more than mere association with a suspected criminal. Id. at 516. The court noted that Vravis and his vehicle were present in the immediate vicinity of the drug transaction at all times before, during and after the sale. Id. Before the sale, Vravis was observed standing next to Clark's vehicle looking at the front tire. Id. During the exchange, Vravis's vehicle was parked in a location from which its occupants could easily view the transaction. Id. Immediately after the sale, agents observed Clark enter Vravis's car, return to his own vehicle, and begin to leave. Id. Further, Agent Carter knew that Clark's drug source—"the guys" or "city boys"—was in town and was helping to fix Clark's tire. Id. At the time of the transaction, Clark told Agent Carter that his source was "over there." Id. Based on this information, Agent Carter was able to connect "the guys" to Vravis and his associates. Id. Accordingly, the court found that law enforcement agents could have reasonable concluded that Vravis was Clark's drug source and was there to oversee the transaction between Clark and Agent Carter. Id.

Turning now to the instant case, the Court concludes that, at the time of his arrest, probable cause existed to believe defendant was involved in drug trafficking activity.  Unlike in <u>Everroad</u>, the evidence in this case establishes more than a mere presence or association with narcotics trafficking activity.[8]  Agent Benadum testified that Heriberto Penaloza was extremely cautious, difficult to follow on paper, and frequently employed counter-surveillance tactics to avoid detection by law enforcement. Notwithstanding his great vigilance, on February 7, 2013, Penaloza brought defendant with him to execute a controlled delivery of methamphetamine in the bathroom of a Home Depot in Minneapolis.  On that day, defendant and Penaloza arrived at the Home Depot together in a grey Acura, entered the store at the same time, and left the premises in the same vehicle following the sale.

As in <u>Vravis</u>, the fact that defendant arrived and left the Home Depot with Penaloza, and was present at the scene before, during and after the sale, suggests that he was not merely an innocent bystander, but rather that he was there to assist, protect or supervise Penaloza during the narcotics sale.  <u>See</u> 761 F.2d at 516 ("[A]gents could have reasonably concluded Vravis was Lonnie Clark's drug source and was present to keep an eye on his investment and to ensure he received his portion of the proceeds from the transaction."); <u>cf</u>. <u>United States v. Cowan</u>, 674 F.3d 947, 954 (8th Cir. 2012) ("[A] car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing.") (quoting <u>Maryland v. Pringle</u>, 540 U.S. 366, 373 (2003)).  Indeed, the Supreme Court has noted that drug dealing is "an enterprise to which a dealer would be

---

[8]     <u>Castro-Gaxiola</u>, also cited by defendant, provides no support for his motion.  In that case, the Eighth Circuit rejected Castro-Gaxiola's contention that his arrest was due to his mere presence near other individuals suspected of engaging in criminal activity. 479 F.3d at 583-84.

unlikely to admit an innocent person with the potential to furnish evidence against him." Pringle, 540 U.S. at 373; see also Sotelo, 2010 WL 598606, at *4 (same). As such, defendant's close association with Penaloza and physical proximity to a known narcotics sale, combined with Penaloza's record of extreme caution, could lead a reasonable law enforcement officer to conclude that defendant was involved in drug trafficking.

Additionally, on February 14, 2013, the CI called Penaloza and arranged to pay the outstanding balance from the February 7, 2013 controlled purchase of methamphetamine. Penaloza said he was sick and that he would be "sending his guys" to pick up the money at a Boston Market in Richfield, Minnesota. Consistent with that statement, later that day, defendant and Morales arrived at the Boston Market in the same grey Acura used during the previous sale of methamphetamine. Defendant entered the restaurant, and the CI handed the money to him. Defendant and Morales then left the premises together in the grey Acura. Although there was no discussion with the CI regarding what the money was for, a reasonable law enforcement officer nonetheless could have concluded that the individual who took the cash from the CI was one of "[Penaloza's] guys" and had knowledge of the underlying narcotics sale. See Vravis, 761 F.3d at 516 ("The agents were able to connect 'the guys' to Vravis and his companion when they observed Vravis' conduct and his vehicle . . . near the scene of the transaction.").

Law enforcement officers gained further suspicion of defendant on February 15, 2013, when they observed him, along with Penaloza and Morales, arrive in the grey Acura and enter the Colfax Apartment, a suspected drug stash house; load items from the Colfax Apartment into the Acura; and then leave the premises and ultimately travel

to the Parklawn Complex, another suspected drug stash house. Immediately after defendant, Penaloza and Morales left the Colfax Apartment, police executed a search warrant at this location and discovered large quantities of methamphetamine and marijuana stored in and above a two-drawer file cabinet. The file cabinet was very similar to the one found in Gilberto Penaloza's residence, which also contained methamphetamine.

In sum, the evidence establishes more than defendant's mere association with, or presence near, drug trafficking activity. Law enforcement officers observed defendant accompany or assist Penaloza on several occasions (including during a controlled narcotics sale), ride in the grey Acura that had been used for a prior drug sale, retrieve the outstanding money owed for that transaction, and carry items to and from suspected narcotics stash houses. Based on all of this information and the totality of the circumstances throughout the investigation, a reasonable law enforcement officer could believe that defendant was participating in narcotics trafficking activity. Accordingly, law enforcement had probable cause to arrest defendant, and defendant's motions to suppress evidence and statements obtained subsequent to his arrest should be denied.

## III.    RECOMMENDATION

For the reasons set forth above, IT IS HEREBY RECOMMENDED that

1.      Defendant Eleuterio Izazaga-Pascacio's Motion to Suppress All Evidence Obtained from Unlawful Searches and Seizures [Docket No. 346] be **DENIED**.

2.      Defendant Eleuterio Izazaga-Pascacio's Motion to Suppress Statements Made by Defendant [Docket No. 347] be **DENIED**.

3.     Defendant Eleuterio Izazaga-Pascacio's oral motion to suppress any evidence obtained from a search warrant permitting the use of a GPS tracking device be **DENIED**.

Dated:      February 10, 2016                    *s/ Janie S. Mayeron*
                                                 JANIE S. MAYERON
                                                 United States Magistrate Judge

## NOTICE

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 25, 2016**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  All briefs filed under this Rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.