UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 14-00289 (4) (SRN/JSM)

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | **ORDER** |
| ) | |
| v. ) | |
| ) | |
| **ELEUTERIO IZAZAGA-PASCACIO,** ) | |
| ) | |
| **Defendant.** ) | |

Allen A. Slaughter, United States Attorney's Office, 316 North Roberts St., Ste. 404, St. Paul, MN 55101, for the United States of America.

Daniel L. Gerdts, 247 Third Ave. S., Minneapolis, MN 55415, for Defendant Eleuterio Izazaga-Pascacio.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Objections of Defendant Izazaga-Pascacio ("Defendant") [Doc. No. 369] to the Report and Recommendation of Magistrate Judge Janie S. Mayeron ("Judge Mayeron") dated February 10, 2016 ("R & R") [Doc No. 367]. Judge Mayeron recommended denying Defendant's Motion to Suppress All Evidence Obtained from Unlawful Searches [Doc. No. 346], Motion to Suppress Statements Made by Defendant [Doc. No. 347] and his oral motion to suppress any evidence obtained from a search warrant permitting the use of a GPS tracking device.  The United States of America ("the Government") filed a timely Response to Defendant's Objections ("Resp.") [Doc. No.

374]. For the reasons set forth below, the Court overrules Defendant's Objections, adopts the R & R, and denies Defendant's motions.

I.   BACKGROUND

Defendant is charged with crimes related to alleged money laundering, drug trafficking, and drug distribution. (See Superseding Indict. [Doc. No. 15].) The factual and procedural histories of this matter are well-documented in the R & R and not disputed by either party. (See Objections; Resp.) Thus, for the sake of brevity, the Court refers to the R & R for those histories.

   A.  Factual History

In July 2011, agents in the Minnesota office of Homeland Security Investigations ("HSI") were contacted by their counterparts in Miami, Florida with information about a large sum of money they suspected might be laundered in Minnesota over the coming weeks. (R & R at 2.) HSI used undercover agents to "launder" this money and identified Heriberto Penaloza ("Penaloza") as the primary target of their investigation. (Id.)

Between 2011 and 2012, HSI and other law enforcement agencies engaged in over 500 hours of surveillance and investigatory efforts directed at Penaloza and his money laundering scheme. (Id.) The agents determined that Penaloza ran a "tight knit group" consisting of mostly family members who purported to operate an auto repair shop, but which HSI suspected was a money laundering front related to drug distribution. (See id. at 2–3.) During this investigation, HSI agents found that Penaloza engaged in a wide variety of efforts to avoid detection by law enforcement. (See id. at 4–5.) These efforts included having no property or vehicles registered in his name (instead using those registered in the

name of various girlfriends), using multiple phones at any given time, frequently changing phones and phone numbers, and engaging in driving maneuvers designed to determine if anyone was following him. (Id.)

HSI arranged to begin purchasing methamphetamine from Penaloza using a confidential informant ("CI"). (Id. at 5.) Between September and November of 2012, law enforcement coordinated three controlled buys from Penaloza. (Id.) During these buys, Penaloza required that the CI employ a variety of evasive maneuvers designed to avoid detection by law enforcement and on one occasion used a courier to deliver drugs to the CI in the bathroom of a local Home Depot. (Id.)

During this time, HSI agents received information from a CI that an individual known as "El Tigre" might be accompanying Penaloza. (Id. at 6.) El Tigre was alleged to be Penaloza's drug boss from Fresno, California. (Id.) However, besides this information and a physical description of El Tigre, law enforcement knew little else about this individual. (Id.)

In February of 2013, officers set up another controlled buy from Penaloza. (Id.) Penaloza told the CI that the CI could pay half the cost of the methamphetamine upfront, and the other half a week later. (Id.) The CI was instructed to go to the bathroom of a local Home Depot. (Id.) Penaloza arrived at the Home Depot in a grey Acura with license plate XXX005 (the "Acura"). (Id.) Defendant was a passenger in the Acura. (Id.) Although law enforcement officers did not know Defendant's identity at this time, they observed that he matched the physical description of El Tigre. (Id.) Both Defendant and Penaloza entered the Home Depot where Penaloza delivered the methamphetamine to the CI. (Id.) Penaloza

3

exited the Home Depot, followed shortly thereafter by Defendant, and both departed in the Acura. (Id.)

A few days later, officers suspected Penaloza was spending the night at XXX Colfax Avenue in Southeast Minneapolis ("Colfax Apartment").[1] (Id.) They also suspected Penaloza was using the Colfax Apartment as a drug stash house. (Id.) The apartment's property manager allowed agents to conduct a canine sniff in the common hallway outside Apartment XXX and based on this sniff the agents obtained a search warrant for the apartment. (Id. at 7.)

During this same time, officers conducted physical and electronic surveillance (consisting mostly of "pinging" one of Penaloza's cellphones) of Penaloza. (Id.) This surveillance revealed that Penaloza regularly used the Acura to travel between the Colfax Apartment and an apartment complex in Edina, Minnesota ("Edina Apartment"). (Id.)

On February 14, 2013, the day the CI was to pay the remaining amount owed for the previously purchased methamphetamine, Penaloza stated that he was sick and would be "sending his guys" to pick up the money at a local Boston Market. (Id.) The agents pinged Penaloza's cellphone and confirmed that he was at the Colfax Apartment. (Id.) However, officers observed Defendant riding as a passenger with another individual ("Morales") in the Acura. (Id.) After several stops, the Acura arrived at the Boston Market where both

---

[1] Judge Mayeron referred to the Colfax Apartment as being located in Southwest Minneapolis. (See R & R at 6.) However, it appears that the testimony was that the Colfax Apartment was actually located in Southeast Minneapolis. (See Hearing Tr. from hearing held on 12/14/2015 at 36 [Doc. No. 354].) This minor discrepancy has no bearing on the outcome of the probable cause determination and the Court notes it only for the sake of clarity.

Defendant and Morales entered the restaurant and Defendant collected the money from the CI. (Id. at 7–8.) There was no discussion regarding what the money was for. (Id. at 8.) After collecting the money, Defendant and Morales went to the Edina Apartment where they used a shopping cart to move items, including ordinary household products, from the Acura to the apartment. (Id. at 8.)

The next day, law enforcement officers prepared to execute their warrant on the Colfax Apartment. However, during these preparations, Defendant, Penaloza, and Morales arrived at the Colfax Apartment in the Acura. (Id.) The three were observed carrying bags from the apartment to the Acura. (Id.) Defendant, Penaloza, and Morales then left the Colfax Apartment and headed towards the Edina Apartment.[2] (Id. at 9.)

After the Acura left the Colfax Apartment, police executed their warrant and discovered a large amount of methamphetamine stored in a locked filing cabinet and several pounds of marijuana located in box in a closet. (Id.) The filing cabinet was very similar to another cabinet—which also contained drugs—that officers previously discovered while searching the home of one of Penaloza's family members. (See id. at 3–4, 9.) Based on what they found in the Colfax Apartment, the officers decided they had enough to arrest Penaloza, Morales, and Defendant. (Id. at 9.)

Approximately an hour later, Defendant and Penaloza exited the Edina Apartment and got into the passenger seats of the Acura. (Id.) Morales then came out of the building and headed towards the Acura, but police arrested him, Penaloza, and Defendant before

---

[2] Although the officers lost physical sight of the Acura during this time, they were able to track its progress by pinging Penaloza's cellphone. (See R & R at 9.)

Morales reached the vehicle. (Id. at 9–10.) Police conducted field interviews of Defendant and Morales during which they learned that Morales lived at the Edina Apartment, Defendant's identity, and that Defendant's California driver's license listed his residence as Fresno, California. (Id. at 10.) Defendant was subsequently read his Miranda rights in English and Spanish, indicated he understood those rights, and agreed to speak with law enforcement. (Id.) During that interview, Defendant made several incriminating statements. (Id.)

### B. Procedural History

Defendant asks that the Court suppress all evidence obtained from his arrest on February 15, 2013, including his identity, residence, finger and hand prints, and the statements he made to law enforcement.[3] (R & R at 10.) As the basis for these motions, Defendant claims the officers lacked probable cause to arrest him for drug trafficking and money laundering, relying instead on his association with Penaloza. (Id.) Judge Mayeron found that Defendant's association with Penaloza alone did not give the police probable cause to arrest him. (See R & R at 13–14.) However, Judge Mayeron found that "the evidence establishes more than [D]efendant's mere association with, or presence near, drug

---

[3] Defendant brought an oral motion to suppress evidence resulting from a search warrant that permitted the use of a global position system ("GPS") tracker on the Acura. (See R & R at 10, n.7.) However, in his post-hearing briefing, Defendant conceded that the Government had met its burden and shown that use of a GPS tracker was constitutional. (Id.) Thus, Judge Mayeron recommended denying his motion. (See id. at 10, n.7 and 21.) Similarly, as part of his motion to suppress his incriminating statements, Defendant argued that his statements during the custodial interrogation were coerced and obtained in violation of Miranda, but subsequently abandoned this argument in his briefing. (See R & R at 10, n.7.) Defendant did not raise the issues of coercion or the GPS tracker in his objections. (See Objections.)

trafficking activity[,]" and that "[b]ased on . . . the totality of these circumstances throughout the investigation, a reasonable law enforcement officer would believe that [D]efendant was participating in narcotics trafficking activity." (Id. at 20.) Thus, she recommended denying Defendant's suppression motions. (Id.)

Defendant now objects to Judge Mayeron's recommendations. (See Objections.) Specifically, Defendant argues that the evidence "reveals nothing more than Defendant's association with a known drug-dealer, and presence . . . near the location of a drug sale to an informant." (Id. at 2.) He claims that this was not enough to establish probable cause for his arrest. (See id. at 2–3.)

## II. DISCUSSION

### A. Standard of Review

The Court conducts a de novo review of a report and recommendation involving a dispositive motion to which a party files specific objections. See 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b); D. Minn. L.R. 72.2(b)(3). Motions to suppress evidence in a criminal case are dispositive motions subject to de novo review. See United States v. Raddatz, 447 U.S. 667, 681–82 (1980).

### B. Probable Cause

For a warrantless arrest to be justified there must be probable cause. United States v. Houston, 548 F.3d 1151, 1154 (8th Cir. 2008).

> Probable cause is determined from "the totality of the circumstances as set forth in the information available to the arresting officers at the time of the arrest." A warrantless arrest complies with the Fourth Amendment "when the available facts and circumstances are sufficient to warrant a person of

7

reasonable caution to believe that an offense was being or had been committed by the person to be arrested."

Houston, 548 F.3d at 1154 (quoting United States v. Adams, 346 F.3d 1165, 1169 (8th Cir. 2003)). An officer's familiarity with drug trafficking is a relevant factor to consider when assessing probable cause in narcotics cases. United States v. Castro-Gaxiola, 479 F.3d 579, 583 (8th Cir. 2007).

Police are afforded "substantial latitude in interpreting and drawing inferences from factual circumstances, but such latitude is not without limits." Adams, 346 F.3d at 1170 (quotations omitted). Suspicion of criminal activity alone is not enough for probable cause. Id. at 1169–70. However, officers need not actually witness criminal activity—or have obtained enough evidence to convict an individual—for there to be probable cause justifying an arrest. United States v. Winarske, 715 F.3d 1063, 1067 (8th Cir. 2013). "Instead, the mere 'probability or substantial chance of criminal activity, rather than an actual showing of criminal activity,' is all that is required." Winarske, 715 F.3d at 1067 (quoting United States v. Mendoza, 421 F.3d 663, 667 (8th Cir. 2005)).

"[I]t is settled that mere association with a known or suspected criminal, or mere presence in that person's automobile, does not create probable cause to arrest." United States v. Everroad, 704 F.2d 403, 406 (8th Cir. 1983). Similarly, a person's presence in an area known for narcotics trafficking or other criminal activity does not establish probable cause. Id. However, this does not mean that an individual's associations or location are irrelevant when assessing probable cause. For instance, if the nature of the criminal activity at issue suggests it could not normally be conducted without the knowledge of those

8

present, the physical presence of an individual during such activity weighs in favor of finding probable cause. See United States v. Clark, 754 F.2d 789, 791–92 (8th Cir. 1985) (citing United States v. Hillison, 733 F.2d 692, 697 (9th Cir. 1984)). Similarly, probable cause often exists when a defendant's association with a criminal suspect is contemporaneous with the time of the criminal activity. See United States v. Caves, 890 F.2d 87, 95 (8th Cir. 1989) (citing Clark, 754 F.2d at 791; Hillison, 733 F.2d at 697); United States v. Sotelo, No. 09-cr-254 (JNE/AJB), 2010 WL 598606, at *3 (D. Minn. Feb. 18, 2010) ("The Eighth Circuit has repeatedly distinguished Everroad in cases where the association between an individual and another engaged in suspected criminal activity took place at the time of the criminal activity."); see also Farkarlun v. Hanning, 855 F. Supp. 2d 906, 918–19 (D. Minn. 2012) ("While the Fourth Amendment does not permit guilt by association, it does allow police officers to use common sense and infer a common enterprise among co-passengers of a small automobile where drug dealing is likely." (internal citations omitted))

Here, the officers had much more than Defendant's "physical proximity to a crime combined simply with a brief association with a suspected criminal" when formulating their probable cause. See Everroad, 704 F.2d at 407. First, Defendant's association with Penaloza was not brief. He was observed on numerous occasions, over the course of more than a week, accompanying Penaloza and Morales for long periods of time.

Second, those periods of association were contemporaneous with criminal activities such as controlled drug buys and what the officers suspected was the transportation of narcotics from one location to another. See Caves, 890 F.2d at 95 (where a defendant's

association with an individual suspected of trafficking narcotics was contemporaneous with the suspected criminal activity, this supported a probable cause finding). Those activities are not the sort which could normally be conducted without the knowledge of the people present. See Clark, 754 F.2d at 791–92 (a defendant's presence in her husband's vehicle while he conducted a drug deal allowed officers to formulate probable cause to arrest the defendant because "[t]he criminal activity here was apparent"). Furthermore, the officers knew that Penaloza ran a "tight knit" association and regularly engaged in efforts to avoid detection by law enforcement—thus, it was reasonable to surmise that Penaloza would not allow someone who was not also involved with, or at least knowledgeable about, these criminal activities to be present while they were performed. Defendant was more than just present during this criminal activity—he actively participated in it by collecting money from the informant.

Third, Defendant fit the physical description of an individual the officers suspected was connected with Penaloza's narcotics operation. Observing Defendant and Penaloza together, engaged in the activities described above, confirmed the information provided to the officers by their informant. See United States v. Velazquez-Rivera, 366 F.3d 661, 664 (8th Cir. 2004) (when an informant's tip is corroborated by police investigation, this fact supports probable cause). The subsequent discovery of a large amount of drugs in the Colfax Apartment—where Penaloza stayed and Defendant visited on several occasions—further confirmed the officers' suspicions about Defendant's likely involvement in criminal activity. See United States v. Garcia, 197 F.3d 1223, 1227 (8th Cir. 1999) (where police had substantial evidence suggesting an apartment was being used to distribute and traffic

drugs, and a subsequent search of the apartment confirmed this suspicion, police had probable cause to arrest a defendant who attempted to enter that apartment even before it was searched).

Fourth, probable cause must be assessed from the perspective of the narcotics officers involved. See Castro-Gaxiola, 479 F.3d at 583. "Thus, actions that a lay person could view as innocent may be viewed in a more significant, inculpatory light by a trained narcotics officer possessing information from various sources." United States v. Knox, 888 F.2d 585, 587 (8th Cir. 1989). The information provided to the officers by their informant, combined with their narcotics experience and extended surveillance of Defendant and the other criminal suspects, was more than enough to establish probable cause. See Winarske, 715 F.3d at 1067 (probable cause does not require evidence of actual criminal activity, only a probability or substantial chance of criminal activity); Knox, 888 F.2d at 587 (although narcotics officer, acting on a tip from an informant, did not witness any drug-for-money exchanges while surveilling the defendant, the behavior he did witness, in light of his narcotics background, was enough for probable cause); United States v. Vravis, 761 F.2d 513, 516 (8th Cir. 1985) (where a defendant is present before, during, and after a drug sale, and his presence suggests he is involved with the sale based on details about that involvement previously provided to an undercover agent, there is probable cause for an arrest).

## III. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Defendant's Objections [Doc. No. 369] are **OVERRULED**.

2. The Report and Recommendation [Doc. No. 367] is **ADOPTED**.

3. Defendant's Motion to Suppress All Evidence Obtained from Unlawful Searches [Doc. No. 346] is **DENIED**.

4. Defendant's Motion to Suppress Statements Made by Defendant [Doc. No. 347] is **DENIED**.

5. Defendant's oral motion to suppress any evidence obtained from a search warrant permitting the use of a GPS tracking device is **DENIED**.

Dated: March 28, 2016                     s/ Susan Richard Nelson
                                                    SUSAN RICHARD NELSON
                                                    United States District Judge